# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: GINA M. COOKE,<br><br>Debtor. | **Chapter 13 Proceedings** |
| JON FIEBELKORN,<br><br>Plaintiff,<br><br>v.<br><br>GINA M. COOKE,<br><br>Defendant. | **Case No.: 3:18-bk-10014-DPC**<br><br>**Adversary No.: 3:18-ap-00519-DPC**<br><br>**UNDER ADVISEMENT ORDER**<br><br>**[NOT FOR PUBLICATION]** |

This adversary proceeding ("Adversary Proceeding") concerns the dischargeability of obligations owed by the debtor, Gina Cooke ("Defendant") to her ex-husband, Jon Fiebelkorn ("Plaintiff"). At the center of their dispute is a stipulated divorce decree ("Divorce Decree") in Illinois State Court. The Divorce Decree incorporated a marital settlement agreement ("MSA") which provides that Plaintiff would transfer to Defendant title to the parties' marital home at 516 E. Grimm Rd., Eureka, IL 61530 ("Property"). Defendant, in turn, would pay Plaintiff $68,925 less half the costs of refinancing the Property. Defendant never did refinance the Property. Instead she sold it nearly two years after the Divorce Decree. Defendant received $42,983 from the sale closing, none of which was paid to Plaintiff. Plaintiff argues that the $68,925 owed to him by the Defendant is non-dischargeable in her bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(4).[1] This Court now finds Plaintiff has not sustained his burden of proof on these causes of action.[2]

---

[1] Unless indicated otherwise, statutory citations refer to the U.S. Bankruptcy Code, 11 U.S.C. §§ 101 – 1532.
[2] This Order constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

1

# I.  PROCEDURAL BACKGROUND

On August 18, 2018, Defendant filed her chapter 13 bankruptcy case. Plaintiff is listed as an unsecured creditor holding a contingent, unliquidated, disputed claim against Defendant in the amount of $68,925.[3] On January 17, 2020, Defendant filed an Amended Chapter 13 plan[4] to which Plaintiff objected.[5] To date, Defendant does not have a confirmed chapter 13 plan. Last month, Chapter 13 trustee, Edward J. Maney, filed a Notice of Intent to Lodge Dismissal Order.[6]

On November 30, 2018, Plaintiff commenced this litigation ("Adversary Proceeding") by filing a Complaint to Determine Non-Dischargeability of Debt Based on §§ 523(a)(2), (4), (5), & (6) ("Complaint").[7] Defendant filed her Answer to Complaint ("Answer").[8] Defendant later filed an Amended Answer to Complaint and Debtor's Counterclaim ("Amended Answer") which asserted Defendant's counterclaims against Plaintiff for $3,908.69 related to medical costs and the right to setoff $16,804.58 against Plaintiff's unsecured claim.[9] Plaintiff filed an Answer to Debtor's Counterclaim ("Answer to Counterclaim").[10]

Defendant filed her Motion for Summary Judgment as to Plaintiff's Adversary Complaint ("Defendant's Motion for Summary Judgment").[11] Plaintiff filed his Response to Defendant's Motion for Summary Judgment ("Response")[12] and Defendant filed her Reply to that Response ("Reply").[13] On April 19, 2019, this Court held oral argument on Defendant's Motion for Summary Judgment.[14] The Court granted Defendant's Motion for Summary Judgment with respect to Plaintiff's § 523(a)(6) claim but denied

---

[3] Administrative DE 1 at Schedule E/F, page 30. "Administrative DE" references a docket entry in the administrative bankruptcy case 3:18-bk-10014-DPC.
[4] Administrative DE 67.
[5] Administrative DE 73.
[6] Administrative DE 78.
[7] DE 1. "DE" references a docket entry in this Adversary Proceeding 3:18-ap-00519-DPC.
[8] DE 5.
[9] DE 6.
[10] DE 7.
[11] DE 8.
[12] DE 20.
[13] DE 23.
[14] DE 38.

Defendant's Motion for Summary Judgment as to all other claims finding there remained disputed genuine issues of material fact.[15] On February 14, 2020, the parties filed a Joint Pre-Trial Statement ("JTPS").[16]

A discovery dispute was heard by the Court on November 25, 2019. That dispute resurfaced as Defendant's motion in limine[17] which was heard moments before the trial commenced on February 20, 2020. In that motion, Defendant sought to preclude evidence from Plaintiff's valuation "expert." Defendant also sought to deny Plaintiff's efforts to admit into evidence Exhibits T and U on the basis of these documents being privileged communications. The Court granted Defendant's motion and precluded introduction of the declaration of Gary Smith or any telephonic testimony from Mr. Smith. Defendant then withdrew his motion as to the claimed privileged documents. Exhibits T and U (2 emails totaling 3 pages) were ultimately admitted into evidence

Just before opening statements commenced, Defendant made an oral motion to withdraw Defendant's Counterclaims.[18] The Court granted that motion and dismissed her Counterclaims with prejudice.[19]

At the conclusion of the trial, the Court also dismissed with prejudice Plaintiff's § 523(a)(5) cause of action for failure to prove that the obligation owed to Plaintiff was a domestic support obligation.[20] What remains in this Adversary Proceeding are Plaintiff's claims under §§ 523(a)(2)(A) and (a)(4).[21]

A month after the trial Plaintiff filed his Closing Brief ("Plaintiff's Closing Brief").[22] Defendant filed her Response to Plaintiff's Closing Brief ("Defendant's Closing Brief").[23] The Court then took this matter under advisement.

---

[15] *Id.*
[16] DE 69.
[17] DE 67
[18] DE 69, page 3, lines 14-15.
[19] DE 73.
[20] *Id.*
[21] *Id.*
[22] DE 75.
[23] DE 76.

3

## II. JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 157(b)(2)(I). The parties have consented to this Court's authority to issue a final order on this matter.[24]

## III. ISSUES

A.   Was the $68,925 debt owed by Defendant to Plaintiff incurred by fraud and therefore nondischargeable under §523(a)(2)(A)?

B.   Did Defendant embezzle the Property sale proceeds from Plaintiff?

C.   Did Defendant owe Plaintiff a fiduciary duty relative to the Property?

D.   If Defendant owed Plaintiff a fiduciary duty relative to the Property, did she commit a defalcation when she failed to pay Plaintiff the Property sale proceeds?

## IV. LEGAL ANALYSIS

### A. Section 523(a)(2)(A) Fraud Claim

Under § 523(a)(2)(A), a

discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt –
…
(2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by –
(A) false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

A plaintiff attempting to prove fraud under § 523(a)(2)(A) must demonstrate: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor

---

[24] See DE 1 and DE 6.

4

sustained damage as the proximate result of the representation.[25] "The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence."[26]

The exception to dischargeability of debts under § 523(a)(2)(A) strikes a balance between competing goals.[27] The exception is to be strictly construed against creditors and in favor of debtors in order to avoid unjustifiably impairing a debtor's fresh start.[28] Congress created this discharge exception to preclude a debtor from retaining the benefits of property acquired by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors.[29]


### B. Section 523(a)(4) Embezzlement Claim

Under § 523(a)(4) a

discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt –
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

"Federal law and not state law controls the definition of embezzlement for purposes of § 523(a)(4)."[30] Under federal law, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been [e]ntrusted or into whose hands it has lawfully come."[31] For purposes of non-dischargeability on an embezzlement claim, a plaintiff must prove the existence of three elements: "(1) property rightfully in the possession of a nonowner, (2) nonowner's appropriation of the property to a use other than which it was entrusted, and (3) circumstances indicating fraud."[32] On

---

[25] *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010). The JPTS acknowledges these are the elements which plaintiff must prove on his 523(a)(2)(A) claims. DE 69, page 15

[26] *In re Weinberg*, 410 B.R. 19, 35 (9th Cir. BAP 2009). See also *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

[27] *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983).

[28] *Id.*

[29] *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000) (quoting 4 Collier on Bankruptcy ¶523.08[1][A] (15th ed. Rev. 2000).

[30] *In re Wada*, 210 B.R. 572, 576 (9th Cir. 1997).

[31] *Id.* (citing *Moore v. United States*, 160, U.S. 268, 269 (1895)).

[32] *Id.* (citing *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991)).

5

each of these claim elements Plaintiff bears the burden of proof by a preponderance of the evidence.[33]

## C. Section 523(a)(4) Defalcation Claim

A debt is excepted from discharge as a "defalcation while acting in a fiduciary capacity" under § 523(a)(4) where "1) an express trust existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created."[34] On each of these claim elements Plaintiff bears the burden of proof by a preponderance of the evidence.[35]

Whether a debtor is or was a "fiduciary" for purposes of a § 523(a)(4) claim is a question of federal law.[36] "[T]he fiduciary relations must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt."[37] The Supreme Court has held that the term "defalcation:"

> includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.[38]

### 1. Express Trust

Bankruptcy courts must look to state law to determine whether the requisite trust relationship exists.[39] When determining the legal relations between spouses, Courts must look to the substantive law of the state in which the divorce decree was entered.[40] Under Illinois law:

---

[33] *In re Brody*, 2017 WL 992408 (9th Cir. BAP 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).
[34] *In re Niles*, 106 F.3d 1456, 1459 (9th Cir. 1997).
[35] *In re Brody*, 2017 WL 992408 (9th Cir. BAP 2017) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).
[36] *In re Cantrell*, 329 F.3d 1119, 1125 (9th Cir. 2003).
[37] *In re Lewis*, 97 F.3d 1182, 1185 (9th Cir. 1996).
[38] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013).
[39] *In re Cantrell*, 329 F.3d at 1125.
[40] *Matter of Albin*, 591 F.2d 94, 97 (9th Cir. 1979)(holding that "[t]he district court [was] also on the mark in looking to the substantive law of Virginia to determine the legal relations between the [ex-husband] and [ex-wife] imposed by their contract incorporated into the Virginia final divorce decree.")

creation of an express trust requires: (1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances which show that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee.[41]

### 2. Equitable Lien

It is a fundamental bankruptcy concept that property rights are to be determined pursuant to state law."[42] State law controls the determination of the validity, nature and effect of a lien.[43] Illinois law applies here because the Property is located in that state. Under Illinois law, "equitable liens may be imposed on real property out of considerations of fairness."[44] "The essential elements of an equitable lien are: (1) a debt, duty or obligation owing by one person to another and (2) a res to which that obligation attaches."[45] Equitable liens have been imposed under Illinois law where "contracts manifest the intent that a particular property or funds be security for a debt whenever there has been a promise to convey or assign the property as security."[46]

### D. Attorneys' Fees

Section 523(d) provides:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified…

---

[41] *Eychaner v. Gross*, 202 Ill.2d 228, 253 (2002).
[42] *Butner v. United States*, 440 U.S. 48, 55 (1979).
[43] *In re S. Cal. Plastics*, 165 F.3d 1243, 1248 ( 9th Cir. 1999).
[44] *Peru Federal Sav. Bank v. Weiden*, 54 N.E.3d 876, 879 (Ill. App. 2016).
[45] *Id.*
[46] Id.

7

"To prevail on a motion for attorney's fees under § 523(d), a debtor must prove three elements: (1) the creditor requested a determination of the dischargeability of the debt; (2) the debt is a consumer debt; and (3) the debt was discharged."[47]

Federal Rule of Bankruptcy Procedure 7054 governs the award of (1) attorneys' fees and (2) costs other than attorneys' fees. Federal Rule of Bankruptcy Procedure 7054 provides:

> (b)(1) **Costs Other than Attorney's Fees.** The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides.
> …
> (2) **Attorney's Fees.**
> (A) Rule 54(d)(2)(A) – (C) and (E) F.R.Civ.P. applies in adversary proceedings except for the reference in Rule 54(d)(2)(C) to Rule 78.

## V.    TRIAL TESTIMONY AND DOCUMENTARY EVIDENCE

### A. Plaintiff's Testimony.

Plaintiff holds a 2018 law degree from Emory University and a mid-1990's master's degree in Psychology. He presently works at the American Center for Law and Justice.

Plaintiff was married to Defendant from 1999 to 2016. Plaintiff was employed during the early days of their marriage. When the party's only child was born, Plaintiff left the work force to care for and homeschool their son. Along the way, the parties moved to the Property which consisted of a log cabin on 8 acres in Central Illinois, just east of Peoria. Plaintiff then took up farming. 1,900 trees were planted on the Property.

Defendant filed for divorce in December 2014 in Woodford County Illinois. The parties ultimately agreed to the MSA which was signed by counsel and filed in the Illinois State Court attached to the form of Divorce Decree which was signed by the court on May 24, 2016. [48] Although Plaintiff was required under the MSA to "immediately" sign the

---

[47] *In re Lionetti*, 613, B.R. 13, 18 (9th Cir. BAP 2020) (citing *In re Stine*, 254 B.R. 244, 249 (9th Cir. BAP 2000), *aff'd*, 19 F.App'x 626 (9th Cir. 2001)).
[48] See Ex. C

8

quit claim deed, it was not signed by him until over a year later and then delivered to his lawyer on July 20, 2017. Plaintiff expected the quit claim deed to "remain at my attorney's office until there was a sale or a refinance." Plaintiff's lawyer sent the quit claim deed to Defendant's lawyer in November 2017.[49] The deed was recorded March 22, 2018.[50] The sale closed on April 13, 2018.

Paragraph VII of the MSA states "[t]he parties agree to waive maintenance now and forever." Plaintiff testified that he was willing to waive any claim for spousal maintenance because he considered such support obligation to be memorialized in the MSA's requirement that Defendant would pay him from her refinance of the Property. He testified he would not have agreed to the MSA if he was not assured of getting paid from the Property. Plaintiff testified that he would not have signed the quitclaim deed to the Property if he was not to get paid from the Property. He also believed that the "quitclaim secured his funds." When asked at trial why the quitclaim deed was delivered to Defendant's counsel, Plaintiff responded "I have no idea."[51] Plaintiff pointed to Exhibits N[52], O[53], P[54] and Q[55] as Defendant's lawyer's letters reflecting assurances that Plaintiff would be paid from the refinance of the Property.[56]

---

[49] Trial Transcript 10:43:00 to 10:44:20.
[50] Ex. H.
[51] Trial Transcript at 10:44:00.
[52] This January 31, 2017 letter wanted Plaintiff to agree to Defendant relocating (to Prescott, Arizona) with the parties' son. Defendant would then agree to sell the Property. The letter goes on to state: "Jon will get paid as soon as the house sells."
[53] This June 5, 2017 letter states: "If Jon would agree to the relocation [to Arizona], Gina would immediately put the house up for sale and he would be paid in full once the house sells."
[54] This June 7, 2017 letter states: "Gina wants to pay Jon his share of the equity and wants to put the house on the market to do so. Gina also wants to move and sell the house. Jon doesn't live in Illinois and hasn't seen [their son] in over a year…"
[55] This June 27, 2017 letter states: "Gina is attempting to refinance with a new loan officer to remove Jon from liability on the mortgage debt as well as pay him off." The letter goes on to explain that if Plaintiff signed a quit claim deed to the Property, it would enable Defendant to get Plaintiff off the existing mortgage and pay him some of the equity in the Property. The letter also claims: "Once the house sells, there should be plenty of remaining equity (approximately $100,000) available to pay Jon the remaining balance in full."
[56] Defendant's testimony acknowledges her lawyer's letters accurately reflected Defendant's positions in 2017. Trial Transcript 4:40:40 – 4:41:04.

Plaintiff testified that if and when he received the $68,925, he intended to use the money to restart his life.[57] Plaintiff testified that he believes Defendant did not intend to pay him when the MSA was signed in May 2016, did not intend to pay him when the quit claim deed was signed by him on July 20, 2017, did not intend to pay him when the quit claim deed was handed over to Defendant's lawyer in November 2017 and did not intend to pay him when the sale of the Property closed on April 13, 2018. Plaintiff contends that Defendant's intent to never pay him renders her MSA agreements fraudulent. He also contends that Defendant's use of Plaintiff's quit claim deed was fraudulent, was an act of embezzlement and constitutes defalcation while acting in a fiduciary capacity for Plaintiff.

Plaintiffs testimony acknowledged that Defendant paid insurance premiums on the Property from the time their divorce action was commenced (December 2014) through the date of the sale of the Property (April 2018) but he claims he is entitled to 1/2 of the insurance proceeds ($13,646) received by Defendant after a pipe broke and the ensuing flood damaged the Property in late 2017.[58] Plaintiff also acknowledges that the $217,149 owed on the mortgage against the Property at the time the parties separated had been paid down to $167,769 at the time the Property was sold.

Plaintiff acknowledges that the $225,000 sales price for the Property was a fair market price and that the purchasers of the Property were arm's length buyers.

### B. Defendant's Testimony.

Defendant is a linguist, having pursued PhD studies at Illinois State in Normal, Illinois. She worked as a linguist in Chicago and Peoria Illinois. She was married to plaintiff for 16 years. Together they lived on the rural Property in Eureka Illinois beginning in 2006.

---

[57] Plaintiff started law school in August 2015, almost one year before the Illinois State Court's Divorce Decree dissolving his marriage to Defendant.

[58] Plaintiffs closing brief suggests Defendant "allowed pipes to freeze and burst, causing severe water damage to the [Property]." DE 75, page 7 lines 7-8. The Court rejects this characterization. Defendant did not intend to cause this damage to her Property.

The parties refinanced the Property debt in 2009 and again in 2012, at which time they agreed to a 15-year amortization with monthly payments of $1,700. Once the parties separated, Defendant wanted to refinance the Property debt on a 30-year amortization in an effort to reduce the monthly mortgage payments. She came to understand she would need to roll all of her secured and unsecured debt into a refinancing. At no time did any banker or mortgage broker ever tell her a refinancing could not or would not happen. However, on September 5, 2017, when she received a copy of an August 21, 2017 appraisal[59] of the Property at $245,000, she realized she needed to sell the Property.

In November 2017, Defendant contacted a realtor to list the Property for sale. The original list price of $309,000 was reduced in December 2017 to $289,000. Flood damage occurred at the Property when frozen pipes burst in December 2017. On January 31, 2017, Defendant emailed her divorce lawyer informing her of the flood damage and indicating Defendant was considering the impact of a foreclosure of the Property and her possible bankruptcy.[60] She wanted to know what would come of her debt to Plaintiff. Her lawyer replied indicating she did not know what would come of Defendant's debt to Plaintiff in a bankruptcy and suggested Defendant contact a bankruptcy lawyer.

Only one potential buyer surfaced. That offer was countered by Defendant at $250,000 together with an indication that Defendant would cover flood repairs. The Buyers agreed to pay $225,000 but did not require repairs to be made to the Property. These were the only offers in the six months between the initial listing and the April 2018 sale.

The Property sale did not produce enough money to pay all of Defendant's unsecured creditors. In January 2018, Defendant discerned from internet searches that her obligation to Plaintiff under the MSA was a divorce property settlement which could be discharged in a chapter 13 bankruptcy filing. On February 26, 2018, Defendant reported

---

[59] Ex. 17.
[60] Ex. T.

11

to her divorce lawyer that Defendant had a buyer for the house at $225,000 and that she learned "that a property settlement is dischargeable in a chapter 13."[61]

Despite the Divorce Decree's requirement that Defendant pay Plaintiff $68,925, she paid nothing to him from the Property sale. Defendant used the net sale proceeds to pay certain living expenses, including some credit card bills and getting her nails done. Most of the sales proceeds were used to pay taxing authorities, medical and dental expenses and to hire her bankruptcy lawyer.[62] While acknowledging that she owed Plaintiff $68,925, she testified she owed far more debt than she could pay and believed she could not prefer Plaintiff over her other creditors. Although Defendant's divorce lawyer suggested Defendant offer to deed the Property to Plaintiff,[63] Defendant rejected this idea because, by then, Plaintiff had not lived in Illinois for several years.

Defendant's mother lived in Prescott Arizona. Once the Illinois State Court permitted her to leave Illinois, Defendant and her son moved to Prescott a week later. The parties' son began attending Prescott High School on August 3, 2017.

When Defendant listed the Property for sale in November 2017, she was told she needed the quit claim deed from Plaintiff. The signed quit claim deed was transmitted to Defendant's divorce lawyer. Defendant directed her lawyer's office to record the quit claim deed in Woodford County Illinois on March 22, 2018.

After Defendant filed bankruptcy on August 18, 2018, she received a check from the Property sale escrow company for $7,575. Defendant acknowledged her chapter 13 plan does not call for surrender of this amount, but it has been placed in a bank account.

Defendant adamantly testified that she always intended to pay Plaintiff the $68,925 called for under the MSA. It was not until January 2018 that she realized Plaintiff's claim against her might be dischargeable if she filed a chapter 13 bankruptcy.

---

[61] Ex. U.
[62] Defendant's bankruptcy counsel was first contacted by Defendant in March 2018.
[63] Ex. T.

# VI.    ANALYSIS

## A. Factual Findings

Defendant owes a debt to Plaintiff in the amount of $68,925.[64] This debt is an obligation of Defendant's incurred in the course of the parties' divorce. This obligation is spelled out in paragraph VIII of the MSA[65] which provides, in relevant part:

> …the wife is awarded the martial [sic] [Property] free and clear of any interest of the husband, subject to the debt thereon and her obligation to pay Jon his half of the equity (68,925) minus closing costs. Jon shall sign a quit claim deed immediately and Gina shall receive it when she removes Jon's name from the loan and pays him his equity. Jon's attorney shall hold said quit claim deed until provided proof of the refinance.

At the time they entered into the MSA, the parties agreed the value of the Property was $355,000[66] and the debt against the Property was $217,149. The parties also agree that, at the time of sale of the Property, the mortgage had been paid down to $167,769.[67]

Under paragraph V of the MSA, the parties agreed:

> The [Defendant] shall keep the former martial [sic] [Property] and hold [Plaintiff] harmless on said debt…The [Defendant] shall promptly refinance the [Property] to pay [Plaintiff] his one half interest in the home based on the current valuation and amount owed when the parties separated. The parties agree the current appraised value of the [Property] is $355,000 and the amount owed on the mortgage when the parties separated was $217,149.00. [Defendant] shall refinance the [Property] and pay [Plaintiff] his equity in the [Property] which has been determined to be $68,925 minus the closing costs for the refinance.

---

[64] Administrative DE 1, Schedule F, page 30 of 71.

[65] There is some debate over who actually prepared the MSA and whether the Court should construe ambiguities in the MSA against that party. See DE 76, page 6. Both parties to the MSA were represented by Illinois licensed domestic relation lawyers, both parties acknowledged at paragraph 3 that they had "freely and voluntarily" signed the MSA and both parties agreed to the merger clause at paragraph 4 of the MSA. The Court will not construe any ambiguities in the MSA against or in favor of either party.

[66] Defendant's Closing Brief (DE 76, page 3) criticizes the March 11, 2016 Property appraisal (Ex. J) but this Court will not disturb the parties' agreed value. This appraised value stood as the cornerstone for the financial terms contained in their MSA and the Illinois State Court's approval of the MSA. Moreover, the JTPS did not identify the April 2016 value of the Property as an issue to be resolved by this Court.

[67] The post-separation principle reduction in the parties' mortgage was, therefore, approximately $50,000 This reduction was accomplished because Defendant was making mortgage payments of $1,700/month after the parties separated and until the time the sale closed. In effect, by retaining from the Property sale the sum of $42,983 Defendant recovered the principle paydown she alone made on the parties' mortgage.

Although Defendant's Schedule F listed her debt to Plaintiff as contingent, unliquidated and disputed and Defendant's closing brief suggests she only owes Plaintiff half of the net proceeds from the Property sale ($21,491), the Court finds the MSA calls for Plaintiff to be paid $68,925[68] and this amount is not subject to subsequent reformation simply because two years after the MSA the parties' equity in the Property turned out to be considerably less.

From the date the Illinois State Court approved the Divorce Decree, Defendant and only the Defendant was the lawful owner of the Property. The MSA makes clear that her ownership of the Property was "free and clear" of any claims owed to Plaintiff by Defendant. Under the MSA, Plaintiff was required to "sign a quit claim deed immediately." Plaintiff may have breached the MSA by failing to execute a quit claim deed on the Property until July 20, 2017, over one year after the Divorce Decree, but that does not alter the fact that Defendant owned the Property from June 16, 2016, forward.

Defendant was not entitled to receive Plaintiff's quit claim deed until Plaintiff was paid the sum of $68,925 and he was released from liability under the mortgage against the Property. This, of course, caused a chicken and the egg problem because Defendant would find it difficult to refinance or sell the Property without the quit claim deed. Nevertheless, Defendant owned the Property from the date of the Divorce Decree. Plaintiff incorrectly reads the MSA to essentially provide Defendant ownership to the Property contingent upon ("subject to") Plaintiff being paid $68,925 and being relieved of liability on the mortgage. This Court finds that the MSA's "subject to" language means the Property belonged to (was awarded to) Defendant at the time of entry of the Divorce Decree but that she then had the duty to subsequently remove Plaintiff from the mortgage and pay him $68,925.

It was important to Plaintiff that he be removed from liability on the mortgage. He knew Defendant was in financial straits and that he was exposed to a credit risk on that

---

[68] While this debt may well be nondischargeable under § 523(a)(15) if Defendant were a debtor under chapter 7, Defendant is in a chapter 13 proceeding.

mortgage. Defendant's sale of the Property or refinance of that debt would accomplish this goal.

Plaintiff testified, and this Court finds, that Plaintiff would not have signed the MSA if he thought he would not get paid at the time of refinance or sale of the Property. However, having signed the MSA and having obtained the Illinois State Court's approval of that MSA, Plaintiff had the obligation to "immediately" sign the quit claim deed in Defendant's favor. The parties and the Illinois State Court knew Defendant's ability to pay Plaintiff $68,925 through a refinance (or a sale) would take time. Her debt to Plaintiff was supposed to eventually be paid but it did not change the fact that she owned the Property from the time the Divorce Decree was entered.

Plaintiff could, and probably should, have protected his rights to payment by taking a mortgage lien against the Property or insuring that his quit claim deed not be recorded unless and until he was paid $68,925 from the close of a sale or refinance of the Property. He delivered his quit claim deed to his lawyer on July 20, 2017. At that time, he knew that a refinance of the Property would not be able to fully pay his $68,925 claim. He also knew that, since the Illinois State Court had just approved Defendant's request to relocate to Arizona, Defendant would likely be selling, not refinancing, the Property. Defendant's lawyer told his lawyer as much in her letter of June 27, 2017.[69] However, his lawyer's office handed over the quit claim deed to Defendant's counsel in November 2017. Neither a sale nor a refinance of the Property was imminent in November 2017. The sale did not occur until four months later.

On March 22, 2018, Defendant first learned that her lawyers had possession of the quit claim deed. She instructed her lawyer's office to record the original quit claim deed with the Woodford County, Illinois Recorder's Office.[70] The quit claim deed was recorded the same day.[71]

---

[69] Ex. Q.
[70] Ex. V.
[71] Ex. H.

15

Defendant's Closing Brief suggests it "was delivered from [Plaintiff's] domestic relations counsel, with nothing more than a basic enclosure letter, in mid November 2017"[72] but the cite to the trial transcript does not support this contention. The transmittal letter was not introduced into evidence. Essentially, the record is silent as to why and under what inducements the deed was transmitted to Defendant's lawyer on that day in November 2017. Plaintiff has not persuaded this Court that, at the time the quit claim deed was delivered to Defendant's lawyer, Defendant or her agents obtained that deed by misrepresentations to Plaintiff or his lawyer.

The Property was owned by Defendant and only Defendant from the time of the Divorce Decree. After the Divorce Decree, Defendant and only Defendant paid the insurance premiums due on the Property. Defendant and only Defendant was entitled to receive the insurance proceeds paid to Defendant on account of the 2017 flood damage at the Property.[73] Moreover, Defendant had no obligation to Plaintiff to utilize these insurance proceeds to repair or improve the Property. Not using the insurance proceeds to rehabilitate the Property did result in a lower sales price but since neither the Property nor the insurance proceeds belonged to Plaintiff, he cannot be heard to cry foul on account of the insurance money not being expended on repairs to the Property.[74]

Plaintiff cites Ex. E, pages 19-20 as the basis for accusing Defendant of knowing she could not "promptly" refinance the Property as required by the MSA.[75] This pleading filed in the Illinois State Court by Defendant's lawyer notes that she had been told by a banker that her debt to income ratios were too high to qualify for refinancing and that refinancing was still out of reach even after obtaining a March 11, 2016 $355,000 appraisal[76] of the Property. Importantly, this April 25, 2016 pleading indicated Defendant wanted to stay in the home until their son finished high school, knew she would have to pay the mortgage, knew she had to find a way to reduce her monthly expenses, and went

---

[72] DE 76, page 13, lines 6-9.
[73] There has been no suggestion that the insurance check was issued to anyone but the Defendant.
[74] See DE 75, page 8 where Plaintiff takes issue with the claimed misappropriation of the insurance proceeds by Defendant.
[75] DE 75, page 3.
[76] Ex. J.

on to suggest that Defendant should be required to utilize her best efforts to refinance the Property after the divorce was finalized, that she should be required to make the mortgage payments, that she should live in the Property with their son until he finished high school and that she should then be required to sell the Property if Plaintiff had not yet been paid his net equity in the Property. Defendant's pleading[77] also noted that Defendant had consulted with a bankruptcy lawyer named Charles Covey but, at that time, did not see Defendant's bankruptcy as a viable option. This Court finds that neither this pleading nor the MSA constitute misrepresentations by Defendant. She had tried to refinance the Property before the Divorce Decree and was committing to doing so after the Divorce Decree. The parties knew Defendant was under financial stress and that it would be difficult for Defendant to refinance the Property, but she agreed to continue trying. Despite her continued efforts, she was never able to accomplish this objective. Nobody was surprised when she decided in September 2017 that she needed to sell the Property.

Plaintiff cites Defendant's pretrial deposition testimony[78] as proof that Defendant never intended to pay Plaintiff. That transcript, however, reflects Defendant's consistent intent that, upon a sale or refinance of the Property, she would pay all of her creditors but that Plaintiff could not be paid ahead of other creditors.

Plaintiff points to Defendants email[79] to her mortgage broker, Roberta Cappello, as proof that, "as of June 2017, [Defendant] had already formed an intent to move forward without paying [Plaintiff] in full, without [Plaintiff's] consent."[80] That email actually demonstrates that Defendant was working with her mortgage broker to obtain Plaintiff's yet unsigned quit claim deed for recording so he could be removed from liability on the parties' existing mortgage. Removing him from exposure on that mortgage was one of Plaintiff's primary objections in the MSA.

After the Illinois State Court's July 20, 2017 hearing, the Property was appraised in August 2017 for $245,000. With this unexpected $110,000 reduction in the appraised

---

[77] Ex. E, page 20. Plaintiff's Illinois State Court May 9, 2016 position paper is at Ex. F.
[78] Ex. Y, page 109, November 13, 2018.
[79] Ex. S, an email dated June 27, 2017.
[80] DE 75, page 5, lines 14-22.

value of the Property, a refinance appeared unlikely. However, since Defendant was finally free to relocate to Arizona, she moved to Prescott with the parties' son, enrolled him in the fall semester at a local high school and began exploring the prospects of selling the Property. She alone continued making mortgage payments, decreasing the principle balance by approximately $50,000 since the parties separated. Since she was now paying for living expenses in both Arizona and Illinois, Defendant finally listed the Property for sale in November 2017. The late 2017 flood damage at the Property was not intentionally caused by Defendant. There is no evidence that Defendant caused waste on or a devaluation of the Property. Defendant did not unduly or unreasonably delay either her refinance efforts or the ultimate sale of the Property. The Property was sold in April 2018 to an arm's length buyer at the fair market price of $225,000.

Plaintiff suggests Defendants bankruptcy filing is all about dodging Plaintiff's claims against her (DE 75, page 9, lines 20-21). While Plaintiff holds a significant claim against Defendant, he holds less than 50% of the unsecured creditors' claims in this case. Defendant's bankruptcy schedules[81] reflect unsecured claims totaling $162,732, including Plaintiff's unsecured claim of $68,925.

At the very heart of Plaintiff's claims are the many promises made to pay Plaintiff, whether through a refinance or sale of the Property. It is true that Defendants and her lawyer on numerous occasions promised to pay Plaintiff the $68,925 called for under the MSA. Defendant always acknowledged her obligations to pay Plaintiff this amount. This Court finds that, when Defendant signed the MSA, she fully intended to pay Plaintiff his 1/2 of the equity in the Property. The Court further finds that, when Defendant's counsel sent numerous letters to Plaintiff's lawyer in 2017,[82] at those times, Defendant not only intended to fully pay Plaintiff the amounts she owed him but intended to do so from a refinance and/or sale of the Property. This Court further finds that Defendant intended to pay Plaintiff from the Property sale until the first quarter of 2018 when she was informed that Plaintiff was merely an unsecured creditor, like so many of her other creditors. With

---

[81] Administrative DE 1, page 32 of 71.
[82] See Exs. N, O, P, and Q.

limited cash available to pay her living expenses and creditors, Defendant chose to pay certain prebankruptcy living expenses and selected unsecured debts. She was not legally or contractually required to pay Plaintiff ahead of her other creditors.

Defendant's testimony to the effect that she could not pay Plaintiff from the Property sale proceeds because to do so would improperly prefer one unsecured creditor over another is, of course, incorrect. There is nothing illegal or even improper in preferring one antecedent creditor over others within the §547 preference period. However, had Defendant paid some of the Property sale proceeds to Plaintiff, he may well have faced a preference avoidance action in Defendant's subsequent bankruptcy case.[83] Moreover, had Defendant not sold the Property before her bankruptcy Plaintiff's position would likely not have improved. Plaintiff holds an unsecured claim against this bankruptcy estate.

The record in this matter is replete with evidence of the mutual disdain the parties hold for one another. Plaintiff for quite some time refused to consent to Defendant relocating to Arizona with their son even though their son apparently wanted to move away from Illinois and Plaintiff had long since moved out of state. The parties' March 2018 email exchange[84] is another fine example of the ugliness between them. There has been plenty of ugliness to go around in the parties' long running, "highly contentious domestic relationship."[85] At trial their antipathy was palpable. The Court does hope, however, that the parties someday find a way to become civil with one another, if for no other reason than out of respect for the well-being of their son.

### B. Facts Applied to the Law

Plaintiff claims the $68,925 owed to him by Defendant is nondischargeable. He cites three portions of the Bankruptcy Code in support of his contentions. Before discussing Plaintiff's theories, the Court notes that, while Plaintiff's claims against Defendant total $68,925, at most, only $56,629 could possibly constitute

---

[83] Defendant also suggests Plaintiff may have faced a fraudulent transfer avoidance action. DE 76, page 33. These hypothetical horrors did not come to pass and the Court will not decide whether Defendant is correct in her conjecture.
[84] Ex. W.
[85] DE 76, page 3, lines 1-2.

nondischargeable damages since that is the total amount Defendant received from the Property sale and flood insurance proceeds. The $56,629 is broken down as follows: 1) $35,408 disbursed by the title company to Defendant at the time of the April 13, 2018 close of escrow on the Property sale,[86] 2) the amount of $7,575 paid to Defendant after her bankruptcy filing when it was realized that the escrow amount withheld for RK Builders, Inc. was not due to that entity, and 3) $13,646 received as insurance proceeds from the 2017 flood damage to the Property. Since Plaintiff had no claim to the insurance proceeds, Plaintiff's nondischargeable claim, at most totals $42,983 ($35,408 + $7,575).

1. <u>Section 523(a)(2)(A)-Fraud Claims</u>

For Plaintiff to succeed on his §523(a)(2)(A) claims, he must prove, by a preponderance of the evidence, the following elements: (1) the Defendant made a representation to the Plaintiff; (2) the Defendant knew the representation was false; (3) the Defendant made the representation with the intention and purpose of deceiving the Plaintiff; (4) Plaintiff justifiably relied on the representation; and (5) Plaintiff sustained damage as the proximate result of the representation.

The Court finds Defendant did repeatedly represent to Plaintiff that he would be paid $68,925, that Plaintiff justifiably relied upon those representations and that Plaintiff has been damaged in the $42,983 amount paid to Defendant, and not paid to him, from the sale closing. Plaintiff, however, has not carried his burden of proof on elements 3 and 4.

Defendant contends that a promise to pay someone in the future is not the type of representation to which §523(a)(2)(A) liability can be found. This Court need not address this question because the Court finds that, at no time relevant to this matter, did Defendant misrepresent her intention to pay Plaintiff. Defendant knew she owed Plaintiff $68,925 and for nearly two years believed that he would need to be paid, at least in part, from the proceeds of a sale or refinance of the Property. Her belief was not unfounded. Plaintiff

---

[86] Ex. I, page 2 of 3.

alone controlled whether he would be paid from a sale or refinance because he controlled the timing and circumstances for the recording of his quitclaim deed. However, when the deed was handed over to Defendant, he lost that important leverage. He was at all times an unsecured creditor but, if he did not allow the quitclaim deed to be recorded unless he was paid, then he was in control of up to $68,925 of the net proceeds from the sale transaction. Moreover, by keeping the quitclaim deed in safe keeping, Plaintiff did not simply rely upon Defendant's promise to pay him. The MSA was designed to place in Plaintiff's hands the power to prevent the refinance or sale of the Property until he was paid what was owed to him. He or his agents failed to protect or preserve that power but not because of any misrepresentation by Defendant or her agents.

Plaintiff cites a decision from the Northern District of Ohio in support of his argument that Defendant's failure to pay the debt owed him under the Divorce Decree must be held nondischargeable. His reliance on *In re Bethel*[87] is, however, misplaced. In *In re Bethel*, the court expressly stated the widely accepted rule that, "[i]n order to establish that a debtor knowingly acted with the intent to deceive, it must be shown that **at the time the debt was incurred**, the debtor never had any intention of repaying the obligation in full" (emphasis added).[88] The court went on to note the "general timing and chronology of events" in that case. There, the debtor obtained her share of equity in the marital residence "at essentially the same time the [d]ebtor signed the separation agreement."[89] The court found that, having failed to pay the spouse when the debtor received the equity, the debtor had fraudulent intent when executing the separation agreement. The facts in that case are distinguishable. Here, in May 2016, Defendant and Plaintiff entered into the MSA which was incorporated into the Divorce Decree. Defendant did not sell the Property until April 2018, nearly two years after the Defendant agreed to the terms in the MSA. This nearly two-year gap dispels any comparison to the

---

[87] *In re Bethel*, 302 B.R. 205 (Bankr. N.D. Ohio 2003).
[88] *Id.* at 208.
[89] *Id.*

facts in *Bethel* because Defendant did not have the intent to deceive Plaintiff when she incurred her $68,925 debt to him.

Similarly, Plaintiff's reliance on *In re Hallagan*[90] is also mistaken because of the unique facts in that case. In *Hallagan*, testimony by the debtor revealed clear fraudulent intent and deceptive acts. For instance, the debtor testified that he formed several entities following the entry of the divorce judgment. The court expressly noted the "rather close time sequence" between the termination of one entity and the creation of another entity that "were one and the same" as indication of debtor's fraudulent intent. Further, the debtor acknowledged that he failed to pay his ex-spouse under the terms of the divorce judgment because of pressure to pay a debt to the Internal Revenue Service. Here, Defendant did not engage in any scheme involving the termination and creation of entities or anything of the sort. Also, Plaintiff did not point to any pressure motivating Defendant to pay claims other than the claim owed to Plaintiff.

This Court finds that, at all times the Defendant's promises to pay Plaintiff the sum of $68,925 were not false nor did Defendant intend to deceive Plaintiff. Moreover, until the end of January 2018 when Defendant learned that Plaintiff was an unsecured creditor and that his claims might be dischargeable in a chapter 13 bankruptcy, Defendant fully intended to pay Plaintiff the net amounts received from the sale or refinance of the Property. The Court does not doubt that Defendant was pleased to learn that she could use the Property sale proceeds to pay some of her expenses and other creditors ahead of Plaintiff. This, however, does not constitute fraud nor does it constitute embezzlement or defalcation. The Court finds Defendant did not acquire title to the Property by fraud or misrepresentation or by embezzlement or defalcation. After Plaintiff's quitclaim deed was transmitted to Defendant's lawyer in November 2017, no further representations were made by Defendant or her agents to cause actions or inactions by Plaintiff or his agents.

Plaintiff's §523(a)(2)(A) fraud claims will be dismissed with prejudice.

---

[90] *In re Hallagan*, 241 B.R. 544 (N.D. Ohio 1999)

## 2. Section 523(a)(4)-Embezzlement Claims

Plaintiff contends that he held an equitable lien against the Property sales proceeds and that Defendant committed embezzlement when she failed to pay him the value of that lien from the Property sales proceeds. Plaintiff testified his claim was secured by the Property and he was to be paid in full at the sale. He surely believed and expected this to happen.

In support of Plaintiff's argument that an equitable lien should be imposed on the Property sales proceeds for purposes of his embezzlement claim, he cites *Peru Federal Sav. Bank v. Weiden*. There the court noted that "[w]hile express words are not required to create an equitable lien, 'it must clearly appear from the instrument or the surrounding circumstances that the maker of the instrument intended that the property therein described is to be held, given, or transferred as security for the obligation.'"[91] In *Peru Federal,* a husband and wife entered into a marital settlement agreement in connection with their divorce. The wife was to transfer her interest in a home to the husband "upon the refinance of the mortgage and note. Upon the refinance of the mortgage and note" the husband was to pay two wife $34,380 within 60 days of the divorce decree "for one-half of the equity in the in the residence." Two years later the husband's lawyers record a judgment lien against the residence. The husband apparently never refinanced the mortgage which was owed by the former spouses. The bank foreclosed its mortgage six years after the divorce. The husband's former lawyers and the wife then fought over the $35,910.00 in excess foreclosure sale proceeds. Reversing the trial court, the Illinois Court of Appeals found that specific language in the separation agreement "clearly indicated the marital residence was security for the [wife's] equity interest …Thus, it is apparent from the judgment and the surrounding circumstances that the parties intended that the property would be "held ***.as security for the obligation." See *Hibernian Banking*, 295 Ill. at 544, 129 N.E. 540.

---

[91] *Peru Federal Sav. Bank v. Weiden*, 54 N.E.3d 876, 879 (Ill. App. 2016) (citing *Hiberian Banking Ass'n v. Davis*, 295 Ill. 537, 544 (1920)).

The dissolution judgment therefore created an equitable lien that has priority over the judgment lien recorded by [husband's lawyers]."[92]

Peru Federal was not a case involving a dispute between formerly married persons or the interpretation of their divorce settlement agreement. Neither was the Peru Federal court determining whether an equitable lien existed for the purposes of finding that embezzlement occurred. Instead, the court was determining whether the ex-wife held an equitable lien that had priority over a law firm's judgment lien in those parties' battle for excess proceeds from a foreclosure sale. Here, the question is not of priority, but instead whether Defendant embezzled sale proceeds subject to an equitable lien.

In Peru Federal, it appears that the wife was, at all times, co-owner of the marital property. Since the co-owners were not married when the lawyers' judgment lien was recorded two years after the divorce, that lien presumably attached to husband's interest in the property but not the wife's interests. More importantly, the wife was never divested of her ownership interest in the property. She was not required to sign a transfer deed until she was paid. She apparently never executed a quit claim deed or allowed a quit claim deed to be filed.

To further demonstrate the difference between Peru Federal and this case, consider whether the Property in our case had not been sold but rather foreclosed by the mortgagee and $42,983 of excess sale proceeds remained after the foreclosure sale. Here, Defendant alone would have the right to claim those excess proceeds because Plaintiff gave his interest in the Property to Defendant at the time of the Divorce Decree. Defendant would still owe Plaintiff $68,925 but he would not have a lien, equitable lien or otherwise, against those excess foreclosure sale proceeds.

Plaintiff next cites In re Wells, 160, B.R. 726 (Bankr. N.D.N.Y. 1993) for the proposition that a debtor's divorce decree created an equitable lien on property where the ex-spouse transferred that marital property to the debtor in consideration for the ex-spouse receiving 30% of the proceeds from the sale of the property. Unlike the case at bar, the

---

[92] Id at 879.

debtor in *Wells* "admits [the ex-spouse] was to receive 30% of the net sales price." These sales proceeds belonged to the ex-spouse. Debtor received those funds and did not pay them to the ex-spouse. The *Wells* court found the debtor embezzled the ex-spouse's funds and held the debt nondischargeable in debtor's bankruptcy. Here, however, Plaintiff did not own or have a secured claim against the Property at the date of sale. Plaintiff was owed money by Defendant but did not have a right to payment of that debt from the Property itself once the quitclaim deed was handed over to Defendant's attorney.

In the case at bar, Plaintiff was required to execute the quit claim deed "immediately" after the Divorce Decree. Defendant became the sole owner of the Property, but Plaintiff was in complete control of his payment rights if and when a Property refinance or sale occurred. He failed to properly protect his rights to payment. This Court rejects Plaintiff's suggestion that he held an equitable lien against the Property. He could have easily recorded an actual lien against the Property.[93] He did not do so. He could have easily escrowed his quitclaim deed but he or his agents failed to properly do so. The quitclaim deed itself could have indicated that payment was due to Plaintiff before the deed could be recorded. This Court will not rescue Plaintiff by declaring that Plaintiff held a fictional equitable lien against the Property nor will the Court find Defendant committed embezzlement by not paying a portion of that lien from the Property sales proceeds.

Plaintiff contends he was put on par with the mortgage debt against the Property.[94] Plaintiff is incorrect in this regard because Plaintiff did not have a lien against the Property as the mortgage holder did. Plaintiff was not a creditor whose claim was secured by the Property nor did he properly protect his interests by transmitting the quit claim deed while simultaneously insisting he receive the required payment, as one ordinarily would do at the closing of escrow. This strategic error (whether Plaintiff's error or the error of his

---

[93] Defendant cites *In re Cox*, 274 B.R. 13 (Bankr. D. Me. 2002) suggesting the Plaintiff could have recorded the Divorce Decree in Woodford County to perfect a lien against the Property. DE 76, page 32. The Court is not so sure. Neither the Divorce Decree nor the MSA contained language granting Plaintiff a lien on the Property which was "awarded" to Defendant. In any event, the Divorce Decree was **not** recorded so the Court need not decide this issue.
[94] DE 75, page 15, lines 13-14.

agents) does not alter the fact that Plaintiff was merely an unsecured creditor holding unsecured claims against Defendant from the time of entry of the Divorce Decree.

From the date of the Divorce Decree, the Property was Defendant's and that Plaintiff held only an unsecured claim against her for $68,925. For Plaintiff to succeed on his embezzlement claim under §523(a)(4), he needed to prove that he was an owner of the Property, that Defendant was rightfully in possession of his ownership interest, that Defendant appropriated his property for a use other than which it was entrusted and that the relevant circumstance indicate fraud. Since Plaintiff was not an owner of the Property, he cannot satisfy the first element of his embezzlement claim. This fact alone stands as a basis to deny this claim. Since Plaintiff did not prove Defendant was in possession of his property, he likewise did not prove an appropriation of his property by the Defendant for a use other than which it was entrusted. Finally, Plaintiff has not carried his burden of proving circumstances indicating fraud in connection with her sale of the Property or her use of the Property sales proceeds.

Even if Plaintiff held an equitable lien against the net Property sales proceeds, the circumstances in this case do not indicate fraud. On advice of counsel, Defendant reasonably believed Plaintiff held no more than an unsecured claim against her. Her use of the net sales proceeds for purposes other than paying Defendant was not an act of fraud or even an indication or suggestion of fraud.

Plaintiff's §523(a)(4) embezzlement claims will be dismissed with prejudice.


### 3.  Section 523(a)(4)-Defalcation Claims

Plaintiff claims Defendant's obligations to him are the result of Defendant's defalcation while acting in a fiduciary capacity and, therefore, nondischargeable under §523(a)(4). Plaintiff argues the MSA created an express trust, that Defendant was the trustee duty bound to act at the Property sale for the benefit of Plaintiff, the trust beneficiary, and that Defendant's failure to pay the trust proceeds to Plaintiff gives rise to his §523(a)(4) claims.

Plaintiff cites *Matter of Albin*, 591 F. 2d 94, 97 (9th Cir. 1979) for the notion that the court is to apply express trust law from the state where spouses were divorced, i.e. Illinois. The Court agrees that it must review Illinois law to determine whether an express trust was created by the MSA.

As noted in Section IV(C) above, under Illinois law:

creation of an express trust requires: (1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances which show that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee.[95]

Here there was no trust declaration, Defendant is not identified as a trustee for Plaintiff or having the duties of a trustee, and the MSA did not indicate the Property was delivered to Defendant as trust property. This Court finds Plaintiff has not established an express trust under Illinois law.

Defendant cites *In re Young* 91 F.3d 1367 (10th Cir. 1996) noting that, for the purposes of §523(a)(4), the existence of a fiduciary relationship is a legal question determined under federal law. *Young* actually found that state law is also relevant to this question and indicated that "an express or technical trust must be present for a fiduciary relationship to exist under §523(a)(4)."[96] That court also agreed 'the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy."[97] Here, the debt at issue was created through the MSA at the very same time Plaintiff claims a fiduciary relationship was formed. *Young* is not binding on this Court but the Court nevertheless adopts the logic of its analysis and find that a fiduciary duty was not imposed on Defendant when her debt to Plaintiff was created by the MSA.

There are more reasons to find Defendant did not owe Plaintiff a fiduciary duty relative to the MSA and the Property sale. It is true that Defendant had numerous

---

[95] *Eychaner v. Gross*, 202 Ill.2d 228, 253 (2002).
[96] *Id* at 1371.
[97] *Id* at 1372.

obligations to Plaintiff. She was required under the MSA to pay the mortgage on the Property, she was to hold Plaintiff harmless on that mortgage, she was to keep the Property insured, and she was to pay him his ½ of the equity in the Property, i.e. pay him $68,925 less closing costs. One might even call these obligations duties owed by Defendant to Plaintiff. None of these obligations or duties, however, were fiduciary duties. The parties always understood Defendant would not be able to pay Plaintiff or obtain a release of his liability on the mortgage unless and until she was able to refinance or sell the Property. When Defendant sold the Property, she was able to satisfy her duty to discharge Plaintiff's exposure on the mortgage and she had funds available to partially pay her debt to Plaintiff. She was fully conscience of her long-standing obligation to pay him $68,925. However, Defendant did not have a fiduciary duty to pay any portion of the Property sale proceeds to Plaintiff. Furthermore, when Defendant learned a month before the closing that her lawyer's office was in possession of the quitclaim deed signed by Plaintiff, Defendant did not have a fiduciary duty to record that deed only upon full payment on his claim of $68,925. It was incumbent upon Plaintiff and his lawyers to assure that his claim against Defendant was paid before or at the same time the deed was handed over. Plaintiff or his agents failed to do so. Their failure was not induced by a breach of a fiduciary duty owed by Defendant to Plaintiff.

Plaintiff also contends the MSA created an express trust and that Defendant, as trustee of that trust created for Plaintiff's benefit, was to pay him $68,925 from the sale of the Property. The Court rejects this argument. At most, Plaintiff's lawyers, not Defendant, served as trustee of a fictional trust designed to release his quitclaim deed only upon payment to Plaintiff. However, Defendant wore no such hat and had no such duty.

Plaintiff's §523(a)(4) claims for defalcation while acting in a fiduciary capacity will be dismissed with prejudice.

### C. Attorney's Fees and Costs

Although both parties seek an award of attorneys' fees and costs, Plaintiff did not prevail in this Adversary Proceeding and the Defendant failed to provide justification or binding authority for granting such an award.[98] For example, Defendant has not argued that this Adversary Proceeding concerns the question of dischargeability of a consumer debt. Defendant has not demonstrated that an award of attorney's fees is justified under Federal Rule of Bankruptcy Procedure 7054. Defendant has suggested Bankruptcy Rule 7068 provides a basis for awarding her fees in this Adversary Proceeding. That Rule, however, pertains to offers of judgment and then only to an award of costs if the ultimate judgment is more favorable to the offeror. Defendant does not point to having made an offer of judgment nor has she identified the costs incurred by her in this action. Having supplied the Court with no legal basis to grant Defendant her attorney's legal fees in this Adversary Proceeding, the Court hereby denies Defendant an award of legal fees.

Plaintiff complains that, at trial, Defendant sought to make Plaintiff look like the "wrongdoer" when it was actually the Defendant who mistreated Plaintiff.[99] Whether Plaintiff was or was not a "wrongdoer" is not at issue in this Adversary Proceeding.

## VII. CONCLUSION

Defendant never falsely represented to Plaintiff her intent to pay him. Until late January 2018 she believed she must pay Plaintiff from net proceeds received from the sale or refinancing of the Property. Moreover, Plaintiff did not rely on her representations concerning payment to him because he and his agents controlled the use of his quitclaim deed. When they failed to control that deed to extract payment at the time of the sale,

---

[98] In Defendant's Closing Brief at page 36, lines 5 – 11, Defendant states: "An award of attorney's fees is sought in this matter as an offset against whatever amount the Court may determine [Plaintiff's] claim to be worth in [Defendant's] bankruptcy action. It is only fair that at some point he be forced to pay for his vexatious claims and litigation. The fact that [Plaintiff] is educated in the law would suggest that he should have recognized a fair disposition before this matter was permitted to reach this result. The Court should likewise be concerned that third-party creditors receive equal fairness." The Court is unwilling to find Plaintiff's litigation in this Court to have been unjustified or vexatious. While the Court is denying all of Plaintiff's causes of action in this Adversary Proceeding, the Court finds his positions in this proceeding to have been fairly debatable and brought in good faith.

[99] DE 75, page 9, line 22 to page 10, line 9.

Plaintiff and his agents alone caused his harm.  Plaintiff's § 523(A)(2)(a) claims will be dismissed with prejudice.

Defendant did not have a fiduciary duty to Plaintiff.  She did not embezzle money from Plaintiff upon the sale of her Property.  The Property was not held by Defendant in an express trust (or any other form of trust) for Plaintiff's benefit.  The Plaintiff did not have an equitable lien against the Property.  Plaintiff's § 523(A)(4) claims will be dismissed with prejudice.[100]

Defendant's counsel is directed to lodge a form of judgment consistent with this Order.

**DATED AND SIGNED ABOVE.**

---

[100] Nothing contained in this Order is meant to resolve Plaintiff's objections to the Defendant's chapter 13 plan based on Defendant's alleged lack of good faith in proposing her plan.